229 A.2d 61.

ISADORE ZUCHOWSKI *vs.* UNITED STATES RUBBER COMPANY.

MAY 3, 1967.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

---

KELLEHER, J. This is an original petition brought by an employee against his employer to obtain compensation benefits under the workmen's compensation act. After a hearing before the superior court a decree was entered denying and dismissing the petition. It is before us on the petitioner's appeal from that decree.

The evidence shows that petitioner was employed by respondent as a worker whose job it was to reroll cloth inserts which were used to separate layers of rubber sheeting. He and a fellow worker would place this fabric on a wooden roller which they had placed on a frame. A switch would be turned and the cloth would be automatically taken up on the roller. This process allowed the fabric to be rolled straight, smooth and free from folds.

The petitioner had ·been employed on the 3 p.m. to 11 p.m. shift for about two weeks in April 1953 when an incident occurred which plays a part of the instant litigation. On April 28, 1953, petitioner had placed a bar through the wooden·roller preparatory to his and his ·co-worker's lifting it onto its frame when the bar slipped from the roller and struck petitioner on his right great toe. Since this occurred in the late evening near the end of the shift, petitioner went home without going to the plant hospital or reporting his injury to his superior or any representative of respondent. The next day he went to the plant hospital and reported his injury to the nurse in attendance. Subsequently an X ray was taken of his toe which disclosed that petitioner had sustained a chip fracture at the·extreme end of his·great toe in the area under the toenail. The·petitioner was advised by the plant physician, Dr. William S. Nerone, to apply "soaks" to·his toe. This fracture was described at the trial by the plant physician as minimal. The record shows petitioner worked a full day on April 29th.

The petitioner testified that on April 30, 1953, as he approached the plant to begin his shift, the odor from the plant distressed him and made him sick to his stomach. He vomited during the afternoon but managed to carry on with his work.

As the hour approached 6:30 p.m., petitioner, his supervisor and fellow employee finished what they were doing and all started for the cafeteria where they were to·have their lunch. The petitioner had brought some food from home which he had left in the fabric room. All three proceeded to a corridor to go out a door which led to the cafeteria. The supervisor, who was in the lead, and petitioner's fellow employee were together because petitioner had momentarily left his associates and stepped into the fabric room, which is immediately adjacent to the corridor, to pick up his lunch. The doorway which leads from the corridor

to the fabric room has no threshold so the floor there is completely level.

Upon their arrival at the cafeteria, the supervisor and petitioner's fellow employee noticed that petitioner had failed to join them. At the same time another employee who was returning from the cafeteria found petitioner in the corridor sitting in a pool of vomit with his hands behind him trying to get up from the floor. He was facing the door which led to the cafeteria and was approximately seven feet from the entryway to the fabric room. There was a pool of blood behind him. When petitioner was asked what had happened, he said that he had blacked out and that he did not know. The petitioner was taken to the first-aid room and Dr. Nerone was summoned. He ordered petitioner to be transferred immediately to St. Joseph's Hospital. Doctor Nerone then summoned Dr. Thomas L. Greason, a neurologist, to the hospital to act as a consultant in the treatment of petitioner. The petitioner was treated by the two physicians during the time he was hospitalized. He was discharged from the hospital on May 24, 1953 and continued to see Dr. Greason at his office for a period of time thereafter.

It is conceded by all the parties that the injuries received by petitioner on April 30, 1953 were a fractured skull, a sub-arachnoid hemorrhage and a cerebral concussion. They disagree as to whether petitioner's hemorrhage was spontaneous or traumatic in origin. In testimony offered in petitioner's behalf both Dr. Greason and a neurosurgeon said that it was traumatic. However, respondent's physician, Dr. Nerone, described the hemorrhage as spontaneous and attributed it to a ruptured blood vessel at the base of petitioner's brain which occurred of its own weakness and was not due to any external influence. It was Dr. Nerone's opinion that as a result of the rupture of a blood vessel, petitioner lost consciousness and fell to the floor thereby receiving the concussion and fracture of the skull.

The only issue raised by the instant record is whether or not petitioner has established a causal connection or nexus between his injuries and his employment. Under G. L. 1956, §28-33-1, it was his burden to establish by the fair preponderance of the evidence that the injuries he suffered arose out of and in the course of his employment and were connected therewith and referable thereto. *Gaudette* v. *Glas-Kraft, Inc.*, 91 R. I. 304. In this cause, where the evidence is neither uncontradicted nor unimpeached, our function by law is to ascertain if there is any competent evidence present in the record to support the findings made by the trial justice. If there is such evidence, his action will be upheld. *Picozzi* v. *Nugent*, 99 R. I. 398, 208 A.2d 99.

The pertinent findings of fact in the decree of the superior court denying and dismissing the petition are in part as follows:

"3. That the injury which petitioner suffered on April 28, 1953 as aforesaid, resulted in no incapacity entitling the petitioner to compensation;

"4. That on the night of April 30, 1953 the petitioner suffered a second injury, being an injury to his head, by reason of a fall caused by a spontaneous subarachnoid hemorrhage;

"5. That neither the said spontaneous subarachnoid hemorrhage nor petitioner's stomach trouble was caused or aggravated by petitioner's employment or the conditions under which it was required to be, or was actually, performed;

"6. That the first injury which occurred on April 28, 1953 did not contribute in any way to the second injury which occurred on April 30, 1953;

"7. That the second injury which occurred on April 30, 1953 did not arise out of the petititoner's employment."

The evidence presented in this cause is in conflict.

While petitioner has briefed several objections which he had duly noted on the record to certain evidentiary rulings

made by the trial justice, an examination of the transcript shows that in several instances, questions which were disallowed by the trial justice and the exclusion of which petitioner here objects were asked elsewhere in the record and a reply received. He further contends that the use of a photograph of the corridor where petitioner fell was erroneous, yet another photograph which depicted the almost exact same area was introduced into evidence without his making any objection thereto. We have considered all these objections and find no reversible error in any of these rulings now questioned by petitioner.

In his effort to show the trauma which gave rise to his hemorrhage, petitioner has propounded several theories which on analysis have no merit because either the evidence on which he bases a particular theory is in conflict and was not believed by the superior court or there was no evidence in the record to support such a theory.

The petitioner suggested that his injuries came about as a result of his being assaulted by an unnamed fellow worker. There was not the slightest shred of evidence to sustain this charge and this theory was summarily dismissed by the trial justice in his decision.

The petitioner's argument that he might have stubbed his toe and thus have fallen was not given credence by the court, who pointed out that the floor in this area where he fell was completely level. The location of the fracture at the base of petitioner's skull showed, as the superior court found, that petitioner fell backwards; and the direction of his fall negated petitioner's allegation that he had stubbed his toe.

Although a neurosurgeon testified in support of petitioner's theory that the pain from the fractured toe coupled with the plant's rubber odor was sufficient to cause him to faint and fall, this proposition found little support from the court, who pointed out that all the fellow workers were

unanimous in their belief that petitioner never complained about any pain in the toe and never limped. Likewise, the trial justice rejected the odor theory because he found that petitioner never mentioned this factor until a hearing had commenced in the labor department in July 1953, nor did he at any time ever complain to Dr. Nerone, Dr. Greason or his fellow workers about the presence of the alleged unpleasant odors.

The court was confronted with conflicting medical testimony as to the nature of the subarachnoid hemorrhage. Doctor Nerone gave his opinion that the hemorrhage was spontaneous. The neurosurgeon who described it as traumatic based his opinion on the results of the angiogram which was taken two and a half months after the fall. It was explained to the court that an angiogram is a diagnostic procedure which consists of introducing into the arteries on the right and left sides of the neck a radiopaque material which goes through the blood vessels which lead to the brain while at the same time X-ray pictures of the skull are taken. This procedure is used to determine the presence of a ruptured aneurysm in the brain. An aneurysm was described as a small saccular dilatation of a blood vessel at the base of the brain. The angiogram disclosed no evidence of this condition. It was on the basis of this test that petitioner's physician rendered his opinion that the hemorrhage was traumatic. He conceded that the failure of the angiogram to visualize a ruptured aneurysm does not rule out its occurrence. He admitted that a blood vessel could rupture and cause a spontaneous subarachnoid hemorrhage and still not be disclosed by the angiogram. He conceded that petitioner's admitted history of a severe headache earlier in the day of April 30th, together with his complaints about nausea and vertigo, were consistent with the onset of a spontaneous subarachnoid hemorrhage. In discussing the testimony of petitioner's neurosurgeon the trial justice stated

in his characteristic, plain, straightforward language as follows: "* * * it makes me doubt his opinion that the petitioner did not have a spontaneous subarachnoid hemorrhage."

Further emphasis for the trial court's finding in this regard is found in his analysis of Dr. Greason's original diagnosis which is set forth in the doctor's letter of June 12, 1953 to respondent. In describing petitioner's injuries, the pertinent portion of this letter reads thusly: "Spontaneous subarachnoid hemorrhage, question — traumatic * * *." Doctor Greason, who was a witness for petitioner, stated that his final diagnosis of a traumatic hemorrhage was based substantially on the findings of the angiograms which were conveyed to him by the neurosurgeon who had performed the test. He was unaware until the time of the trial that petitioner had complained of a headache earlier in the afternoon of the day he fell. In these circumstances, it was for the trial justice to evaluate the testimony of the various physicians. Whether testimony presented by petitioner was stronger or weaker, more credible or less credible, are matters which we as the reviewing court are precluded from considering since the workmen's compensation act makes such findings of fact conclusive. *Barnes* v. *Kaiser Aluminum & Chemical Corp.*, 96 R. I. 469; *Gartner* v. *Jackson's, Inc.*, 95 R. I. 489.

The petitioner finally takes the position that even if his hemorrhage was not traumatic, his injuries suffered were as a result of an idiopathic fall on his employer's premises and accordingly he states he is eligible for compensation. The Maine Supreme Court in *Riley* v. *Oxford Paper Co.*, 149 Me. 418, 103 A.2d 111, defined an idiopathic fall as one which occurs when an employee is suddenly overtaken by an internal weakness, illness or seizure which induces the fall where the originating cause is a physical condition personal to the victim and unrelated to the situation in which

he happens to be or to the external conditions of his employment.

We have in the past awarded compensation to an employee who has suffered an idiopathic fall in the course of his employment from a height which was sufficient to constitute a special risk to which he was exposed in connection with and as an incident of his employment. An employee, a hack driver, in *Carroll* v. *What Cheer Stables Co.*, 38 R. I. 421, who was injured in a fall of four to five feet from the seat of a hack, was paid compensation. In *Corry* v. *Commissioned Officers' Mess (Open)*, 78 R. I. 264, a receptionist who fainted and fell forty feet from a second floor terrace was held to have received compensable injuries.

There is a division of opinion in the courts as to whether an injury due to an idiopathic fall to level ground or floor may be said as a matter of law to have arisen out of the employment. Some courts hold that the employee may recover.[1] The majority of cases deny compensation for level floor, idiopathic falls.[2]

We have held that in such circumstances there is no causal relationship between the injuries and the employment. In *Remington* v. *Louttit Laundry Co.*, 77 R. I. 185, an employee who, like the instant petitioner, fell and struck his head on the cement floor, was denied compensation. There, as here, the trial justice found that the incident which precipitated employee's injuries was in no way related to his

[1]*General Ins. Corp.* v. *Wickersham*, Texas Civ. App. 1950, 235 S.W.2d 215; *Employers Mut. Lib. Ins. Co.* v. *Industrial Acc. Comm'n*, 41 Cal.2d 676, 263 P.2d 4; *George* v. *Great Eastern Food Products, Inc.*, 44 N. J. 44, 207 A.2d 161.

[2]*Andrews* v. *L. & S. Amusement Corp.*, 253 N. Y. 97, 170 N.E. 506; *Cinmino's Case*, 251 Mass. 158, 146 N.E. 245; *Stanfield* v. *Industrial Comm'n*, 146 Ohio St. 583, 67 N.E.2d 446; *Sears Roebuck & Co.* v. *Industrial Comm'n*, 69 Ariz. 320, 213 P.2d 672; *Dasaro* v. *Ford Motor Co.*, 280 App. Div. 266, 113 N.Y.S.2d 413; *Montanari* v. *Lehigh Portland Cement Co.*, 282 App. Div. 1082, 126 N.Y.S.2d 180; *Riley* v. *Oxford Paper Co.*, 149 Me. 418, 103 A.2d 111.

employment. The instant petitioner now urges us to abandon our holding in *Remington, supra,* and award him compensation.

While we have always given a liberal construction to the workmen's compensation act, we cannot by judicial interpretation supply the necessary nexus between injury and employment. This can only be done by competent evidence produced in the appropriate tribunal below. Although the legislature in 1949 amended the workmen's compensation act and removed the requirement that a worker's injuries to be compensable had to be received by accident, it still must be shown that his injuries arose out of his employment.

The fact that the floor where petitioner fell was cement does not, in our opinion, supply the necessary element of special risk which would make his injuries compensable. Floors of all nature and kind are a normal and customary part of one's life be one at home or work. We do not believe that the composition of the floor in and of itself should be the determining factor as to whether there is a special risk incident present in one's employment. Such a criterion would send this court into the endless wilds of speculation. As pointed out in *Riley* v. *Oxford Paper Co., supra,* one could fall heavily on a cement floor without injury, while another might fall on soft sand and break a wrist. The workmen's compensation act does not provide that every workman who is injured while in his place of employment shall be compensated for his injury. We cannot accept the contention that a level floor made of cement or other hard substance in a place of one's employment is a special risk not encountered on a sidewalk, parking lot or one's home where a similar surface exists. The mere coincidence that petitioner happened to fall in respondent's plant on the floor in and of itself does not transfer a non-compensable injury into one which will confer benefits under the com-

pensation act. To hold as petitioner contends would convert workmen's compensation into a form of health insurance. This we cannot accept, as it was never the intent of the legislature to afford this type of protection to an injured workman.

The petitioner's appeal is denied and dismissed, the decree appeal from is affirmed and the cause is remanded to the workmen's compensation commission for further proceedings.

*Edward I. Friedman*, for petitioner.

*Carroll, Kelly & Murphy, Ambrose W. Carroll*, for respondent.